CAROLINE DAVIS, Appellee, *vs.* MARY C. MATHEWS *et al.*
Appellants.

*Opinion filed October 26, 1912.*

DEEDS—*whether grantor possessed sufficient mental capacity is a question of fact.* Whether the grantor possessed sufficient mental capacity to make the deed is a question of fact to be determined by the chancellor from the evidence, and his finding on that question will be given due weight by the Supreme Court, even though the only substantial conflict in the evidence is in the opinions expressed by the witnesses as to the grantor's sanity.

APPEAL from the Circuit Court of Knox county; the Hon. GEORGE W. THOMPSON, Judge, presiding.

WILLIAMS, LAWRENCE, WELSH & GREEN, and F. O. McFARLAND, for appellants.

FORREST F. COOKE, J. J. TUNNICLIFF, and M. J. DAUGHERTY, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an appeal from a decree setting aside a deed made in his lifetime by James W. Davis to appellants for 270 acres of land in Knox county. Appellee is the widow of Davis, who made the deed to appellants on the 22d day of April, 1910. He died June 19, 1910. At the time of his death he was eighty-three years old and appellee (his wife) was seventy-two. They had no children nor descendants of children. The nearest living relatives of Davis were appellants, who were cousins. The nearest relatives of appellee were three brothers. Davis owned 270 acres of farm land, upon which he and his wife lived until about fifteen years before his death, when they moved to the village of Maquon and lived in a residence owned by appellee. After moving to the village the farm was managed and conducted

as a partnership business by Davis and M. R. Scudder, in the partnership name of Davis & Scudder. On account of the age and enfeebled physical condition of Davis the management of the farm was largely entrusted to Scudder. They carried a partnership account in the State Bank of Maquon, against which both of them drew checks, and each of them also carried an individual account. In 1896 Davis and appellee, his wife, executed wills, each making the other sole devisee. The partnership of Davis & Scudder, and each of them as individuals, became indebted to the bank and to William Swigart, president of the bank. Davis and his wife executed a mortgage on the 270 acres of land to secure their note to the bank for $4000, and that indebtedness was unpaid at the time Davis died. Davis was surety for the husband of appellant Mary C. Mathews on a note to the State Bank of Maquon for $3000. Mathews died in January, 1908, leaving the note unpaid, and Davis appears to have been considerably worried about the note and feared he would have to pay it. In February, 1908, he and his wife executed a trust deed to the three brothers of Mrs. Davis, conveying the land to them in trust for the use and benefit of the grantors, or the survivor of them, during their lives, with authority to settle claims and manage and convey the property by good and sufficient deeds. Swigart complained of and objected to that transaction on account of the indebtedness of Davis to him and the bank of which he was president, and on March 5, 1908, Davis and wife by proper instrument revoked the appointment of Mrs. Davis' brothers as trustees. In the meantime the appellant Mrs. Mathews had paid off the $3000 note of her husband, upon which Davis was surety. Up to this time Davis had mental capacity to comprehend the nature and effect of business transactions but on account of age was becoming physically feeble. On the 22d day of April, 1910, he executed the deed to appellants conveying to them

the 270 acres of land, reserving a life estate therein to the appellee. The deed was executed in the State Bank of Maquon, was witnessed by Swigart and Scudder and acknowledged by Adam Kinser, a notary public.

The bill alleges that from about July 1, 1908, on account of senile dementia, James W. Davis' memory and will power were destroyed, and thereafter he was unable to reason or comprehend business transactions or to protect his property against the persuasion of others; that at the time the deed was executed he was mentally unbalanced and incapable of understanding the nature and effect of his act; that he was induced by appellants and their agents to make the deed, they well knowing at the time that he was incapable of understanding the nature and effect of what he was doing. There is no evidence to sustain the charge that the appellants, either directly or indirectly, influenced Davis to make the deed. So far as the evidence discloses they knew nothing about it until after the deed was made. Scudder testified that at the request of Davis he went to Galesburg and employed a lawyer to draw the deed; that he delivered it to Swigart, as directed by Davis, and it was signed and acknowledged by him in the bank of which Swigart was president, neither of appellants being present.

The sole question to be determined is whether James W. Davis had sufficient mental capacity to know and understand the nature and effect of his act. Upon this the opinions of the witnesses for the respective parties,—about an equal number on each side,—differed. Those called for appellee, after describing the acts and conduct of Davis, gave it as their opinion that he was insane when the deed was made. Those called by appellants, after detailing their acquaintance and associations with him and their knowledge and observation of him, gave it as their opinion that he had sufficient mental capacity to understand the nature

and effect of the conveyance. The family physician of Davis testified that for the last four years of his life there had been a gradual decay of his mental powers from arterio-sclerosis. He described numerous manifestations of what he characterized as mental unsoundness or insanity, and gave it as his opinion that at the time the deed was made Davis was mentally incapable of understanding what he was doing. The testimony of other physicians in some degree corroborated the family physician, but they had not had opportunities to observe the condition of Davis equal to those of the family physician. The proof clearly shows a gradual decay or failing of his mental powers during the last few years of Davis' life. In January, February and March, 1910, he was quite insane and required constant attention. His condition improved somewhat for a short time but had become so bad in June that he was adjudged insane and taken to an asylum, where he remained only a few days, his condition becoming so serious that he was removed back home, where he died on June 19. We have carefully read all the evidence, and it shows beyond dispute that for at least the last year or two of Davis' life he was feeble, both physically and mentally. Sometimes he was more rational than at others, but all of the last year or two of his life his mental powers were much impaired. The impairment was not merely failing memory that usually attends old age and which does not necessarily render one incapable of transacting business. It was such a decay or breaking down of the mental processes that much of the time he was undoubtedly rendered incapable of understanding important business transactions. At times he talked understandingly about business and other matters, and did transact some business, such as drawing checks and adjusting some indebtedness. His condition was not one of imbecility at all times, but from a consideration of all the testimony we cannot say the decree was contrary to the evidence and should be reversed for that reason.

Appellants insist that the deed was made pursuant to a plan and intention that had long been in the mind of the grantor. Appellants proved by a number of witnesses that Davis had said, when in good mental condition, he wanted to give some of his property to his relatives; that he wanted his wife to have the use of it as long as she lived but at her death he did not want it to go to her relatives. To some of the witnesses he stated he intended to give his property to appellants after his wife was through with it. Apparently he did not acquaint his wife with this desire and she was not informed of the execution of the deed at the time it was made. We have no doubt from the evidence that he preferred the property should go to his relatives after his death rather than that through his wife it should go to her relatives, but we are unable to say that he had sufficient mental capacity, at the time he attempted it, to make the attempt valid. Just before the deed was made the uncontradicted evidence shows that Davis was, and for some time had been, entirely insane. While there is proof that at the time the deed was made his condition had improved somewhat, it is also shown that it was far from good and very soon after became much worse, and so continued until he died, June 19, two months after the deed was made.

Appellants insist that there was substantially no conflict in the evidence about the facts testified to by the respective witnesses; that the conflict was only as to the opinions expressed as to Davis' sanity, and therefore no weight should be given the decree because the chancellor who heard the evidence had a better opportunity to judge of the credibility of the witnesses and the weight that should be given to their testimony than a reviewing court. Whether Davis possessed mental capacity to make a valid deed was a question of fact to be determined by the chancellor from the evidence. The witnesses testified to their knowledge and acquaintance with him, their opportunities for observing his

mental condition and his acts and conduct upon which they based their opinions as to his sanity. Conceding that all of them were equally honest and truthful, the chancellor who saw them and heard them testify had a better opportunity to judge of the weight that should be given the testimony and the opinions of the respective witnesses than a court of review. But however that may be, a consideration of the evidence fails to convince us that the decree was contrary to the testimony, and no other ground is urged for a reversal.

The decree is affirmed.                    *Decree affirmed.*